IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EXEL INC.,

        Plaintiff,

v.

GROUPON GOODS, INC.,

        Defendant.

No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, Exel Inc. ("Exel"), by its attorneys, for its Complaint against Defendant, Groupon Goods, Inc. ("Groupon"), states and alleges as follows:

## NATURE OF ACTION

1.      In July 2012, Exel and Groupon entered into an Operating Services Agreement, which was amended by the parties from time to time. Under the contract, Exel agreed to provide warehousing, logistics and related services in support of Groupon's business whereby Groupon sells various products directly to consumers.

2.      Exel has performed all of its obligations under the Operating Services Agreement. Groupon, on the other hand, has breached the contract, has breached other agreements entered into by the parties, and has reneged on additional promises it made to Exel and upon which Exel reasonably relied to its detriment. For example, Groupon (a) is withholding overdue payments to Exel relating to amounts which are not in dispute between the parties in an amount in excess of $1.7 million; (b) entered in a separate letter agreement with Exel resolving certain disputed claims for a sum certain but then unilaterally took an additional unauthorized credit in the

amount of $171,000; (c) reneged on an agreement to resolve other disputed claims but nonetheless unjustly accepted the benefits thereunder in an amount in excess of $1.3 million; and (d) expressly authorized Exel to incur costs to meet Groupon's expected need for increased warehouse capacity but then refused to pay Exel for the costs incurred in an amount in excess of $450,000.

3.    Exel has thus commenced this action and asserts claims for breach of contract, unjust enrichment, promissory estoppel, and declaratory judgment.  Exel seeks damages in a total amount in excess of $3.6 million.

## THE PARTIES

4.    Exel is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business in the State of Ohio.

5.    Groupon is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Illinois.

## JURISDICTION AND VENUE

6.    The Court has original jurisdiction of this civil action pursuant to 18 U.S.C. § 1332(a) because (a) the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and (b) there is complete diversity of citizenship between the parties.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), in that Groupon resides in Chicago, Illinois, which is located in the Northern District of Illinois, Eastern Division, and pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to this action occurred in this District.  In addition, the Operating Services Agreement that is the subject of this dispute provides that "the federal and state courts in Cook County, Illinois shall have personal jurisdiction over the parties with respect to and that such

courts shall be the exclusive forum for the resolution of any matter or controversy arising from or with respect to this Agreement."

## FACTS COMMON TO ALL COUNTS

### —THE PARTIES' BUSINESSES—

8.      Exel is the leading contract logistics provider in the U.S., Canada, and Latin America, employing 47,000 associates at more than 500 sites throughout these regions. Exel provides innovative, customized supply chain solutions and third-party logistics to some of the world's best-known and most successful companies. Exel's supply chain design, consulting, warehousing, fulfilment, and transportation services are tailored to assist companies in being more productive, more efficient, and more competitive.

9.      Groupon is an expansion of the well-known offerings of Groupon, Inc., an on-line company that offers discounted prices on certificates for products or services useable at local or national companies. These "groupons" are offered to consumers through Groupon, Inc.'s website and/or through general and customized "deal-of-the-day" marketing offers sent to consumers via e-mail. Groupon, Inc. got its start in 2008 in Chicago by offering half-price pizza deals, then rapidly expanded to a worldwide market with 35 million users to whom it offers discounts on a wide variety of products and services.

10.      In 2011, as part of Groupon, Inc.'s growth strategy, Groupon Goods was launched as an on-line retail arm dedicated to featuring direct deals on retail consumer goods rather than certificates to be used with other companies. Groupon sells a wide variety of products from shoes to coffee makers to big-screen televisions to furniture and much more.

11.      With the expansion into direct sales of goods, Groupon, Inc.'s logistics needs changed dramatically. In contrast to certificates downloadable on-line or delivered via e-mail, warehousing, shipping, and related logistics services would be needed for Groupon's extensive

product offerings. Groupon thus needed to work with a top logistics company with the capability of meeting the North American demand for Groupon products.

—EXEL'S AGREEMENT WITH GROUPON—

12. On July 23, 2012, Exel and Groupon entered into an Operating Services Agreement.

13. On September 10, 2012, Exel and Groupon entered into a First Amendment to the Operating Services Agreement.

14. On December 5, 2012, Exel and Groupon entered into a Second Amendment to the Operating Services Agreement.

15. On April 22, 2013, Exel and Groupon entered into a Third Amendment to the Operating Services Agreement.

16. On May 9, 2013, Exel and Groupon entered into a Fourth Amendment to the Operating Services Agreement.

17. On July 10, 2013, Exel and Groupon entered into a Fifth Amendment to the Operating Services Agreement. (The Operating Services Agreement, with the foregoing amendments, are referred to collectively hereinafter as the "Agreement.")

18. The Agreement requires Exel to provide warehousing services to Groupon, which services include (a) the storage of Groupon products at Exel warehouses located in California and Ohio, and (b) the preparation of warehoused products for shipping from the warehouse locations by a third-party carrier. Prior to the Third Amendment, the Agreement also required Exel to provide certain transportation and home delivery services to Groupon.

19. As compensation to Exel for services rendered, Groupon agreed to "pay to Exel all billed fees, charges and expenses (collectively, the "Fees") in accordance with the schedule of fees, rates and charges set forth on Schedule 2.1."

20.     Section 2.3 of the Agreement relates to "Disputed Amounts," which are "erroneous billings, administrative errors and any other billing errors discovered by [Groupon]. . . ."  Upon written notice of Disputed Amounts, the Agreement requires Exel and Groupon to "work together in good faith to resolve any such disputes," and "[o]nce resolved, the value of the Disputed Amounts will be credited by Exel against the then-current amount due from [Groupon] or [Groupon] will promptly remit to Exel any resulting undisputed amounts owed."

21.     The Agreement further provides, in Section 2.4, that "[i]f [Groupon] fails to make payment of the Fees when due, [Groupon] shall pay to Exel a late payment charge at the rate of one percent (1%) of such Fees per month from the date such Fees were due."

22.     The Agreement also provides, in Section 12.2, that "[t]his Agreement shall not be amended or modified except by a written instrument signed by the Parties."

23.     The Agreement also provides, in Section 12.8, that "[t]he schedules attached hereto, shall be made a part of this Agreement."

24.     Under Sections 3.1 and 3.2 of the Agreement, after the first 180 days following the Effective Date (as defined in the Agreement), either party had the right to terminate the Agreement "with or without cause upon ninety (90) days prior written notice to the other Party."

25.     Upon the termination of the Agreement, for any reason, Groupon agreed in Section 3.3(d) of the Agreement that all of its "payment obligations due and payable in connection with Services performed by Exel prior to the date of or expiration or termination of this Agreement will become due and payable within thirty (30) days."

26.     Section 3.4 of the Agreement (which became part of the Agreement through the Fourth Amendment) provides for an audit and accounting of the products at Exel's warehouse(s)

after notice of termination of the Agreement is given.  Specifically, Section 3.4(a) provides that "[u]pon notice of termination of this Agreement or at expiration of this Agreement, Exel shall provide [Groupon] with a complete and accurate accounting of the Products remaining on site at the Facilities.  Within fifteen (15) days following notice of termination of this Agreement or fifteen (15) days following expiration of the Agreement, the Parties shall mutually select an independent auditor, which auditor shall conduct an assessment and accounting of the Products remaining at the Facilities and share the results of the Independent Audit with both Parties.  The Independent Audit shall be completed and the results agreed by the Parties within thirty (30) days after selection of an Independent Auditor and prior to Exel returning the Product to [Groupon]."

27.     Section 3.4(c) provides that "[p]rovided that [Groupon] has paid Exel all undisputed amounts that are due to Exel as of the date of notice of termination of this Agreement, and provided that the Parties have followed the agreed inventory reconciliation process (*i.e.*, daily snapshots, monthly & quarterly reconciliations, and quarterly audits), [Groupon] may hold back $500,000 from the most recent invoices, pending the results of the Independent Audit."

28.     The "agreed inventory reconciliation process" referred to in Section 3.4(c) of the Agreement was a process discussed and agreed to by Frank Leggio of Exel and Frank Workman of Groupon.  The monthly and quarterly reconciliations began in January 2014 and were to continue monthly/quarterly thereafter.  As part of this process, Exel was to distribute a file containing the reconciliation data (either monthly or quarterly, as appropriate), a meeting of the parties would be held to discuss the data, and Groupon was required to acknowledge and validate the results.  Daily snapshots commenced in April 2014, due to a mutual requirement of both

parties' respective information technology groups, using a similar reporting process. In addition to the daily snapshots, Exel provided to Groupon files for shipments, receipts, and adjustments that facilitated Groupon's ability to keep a perpetual inventory and conduct reconciliations.

### —EXEL FULLY PERFORMS ITS OBLIGATIONS UNDER THE AGREEMENT—

29.    Between July 23, 2012 and the present, Exel provided warehousing services (among other services) to Groupon and fully performed its obligations under the Agreement.

30.    At all relevant times, Exel followed the agreed inventory reconciliation process referenced in Section 3.4(c) of the Fourth Amendment, including by providing daily snapshots, files for shipments, receipts, adjustments, monthly/quarterly reconciliations and quarterly audits, and expended significant resources in doing so.

31.    Groupon, by contrast, did not perform all of its obligations under the Agreement. As set forth more fully below, Groupon, *inter alia*, took credits inappropriately (*i.e.*, above and beyond credits that the parties agreed to), refused to pay for services it expressly requested and authorized Exel to perform at Groupon's expense, refused to pay undisputed invoices, and refused to participate in the required reconciliation processes by failing to acknowledge or validate the data submitted by Exel as agreed.

### —THE LETTER AGREEMENT RELATING TO FREIGHT COSTS—

32.    In the second quarter of 2013, a dispute arose between the parties concerning certain incremental freight charges that Groupon believed were Exel's responsibility (the "Freight Charge Dispute").

33.    On June 24, 2013, the parties entered into and executed a settlement agreement, referred to by the parties as the "Letter Agreement," in full and final resolution of the Freight Charge Dispute.

34.     In the Letter Agreement, Exel agreed to provide Groupon with a $303,000 credit (the "Freight Credit"), which Exel agreed to deduct from a future services invoice to be issued by Exel under the Agreement in early July 2013.

35.     Exel and Groupon agreed in the Letter Agreement that "the Freight Credit is (a) full, final and complete satisfaction of any and all debt(s) arising from or related to disputes or other issues related to freight routing issues, and (b) will settle and resolve any disputes or other issues regarding Groupon's incurring increased freight charges under the Agreement for the Applicable Period" (defined as February 1, 2013 through June 24, 2013).

36.     On or about August 5, 2013, the entire $303,000 Freight Credit was applied against a number of invoices paid as part of Groupon's electronic fund transfer ("EFT") no. 453.4.

37.     Despite Exel's full payment and performance under the Letter Agreement, in May 2014, Groupon took an additional $171,000 freight charges credit against a services invoice, and in doing so, Groupon specifically stated that "[t]he remainder of the $303,000 credit that was partially issued by Exel was applied to this payment."

38.     As of May 2014, there was no "remainder" of the $303,000 Freight Credit. Rather, Exel had already applied the entire Freight Credit in August 2013.

39.     Upon Exel's performance under the Letter Agreement in July 2013, Groupon was not entitled to any additional credits related to the Freight Charge Dispute.  By taking an additional credit in May 2014, Groupon breached the Letter Agreement.

### —THE SIXTH AMENDMENT RELATING TO INVENTORY—

40.     In September 2013, a dispute arose between the parties concerning the handling of certain inventory at Exel's warehouses through September 30, 2013 (the "Inventory Dispute"). Groupon claimed that certain inventory was damaged or subject to "shrink," which refers to a

situation in which the parties' records show different levels of inventory purportedly present at an Exel warehouse. In connection with the Inventory Dispute, Groupon claimed that Exel owed it a total of $457,864.34.

41.     In an e-mail dated October 14, 2013, Exel offered to settle the Inventory Dispute, covering all inventory-related disputes at all warehouses between the parties through September 30, 2013, by (a) providing Groupon a $200,000 credit against pending and subsequent invoices, and (b) implementing a new (lower) rate structure effective retroactively to October 1, 2013.

42.     On October 14, 2013, Groupon responded to Exel's settlement offer via e-mail. Specifically, Ron Mardenly of Groupon wrote, "Much thanks as always and I'm completely aligned."

43.     Following Groupon's response to Exel's settlement offer and in reliance thereon, Exel immediately (a) provided Groupon with the $200,000 credit, and (b) implemented a new (lower) rate structure effective retroactively to October 1, 2013. Groupon accepted both of these benefits.

44.     Because a revised rate structure required a modification to the Agreement, the parties were required sign another amendment to the Agreement. The parties negotiated a Sixth Amendment to the Agreement, but the parties never signed the Sixth Amendment.

45.     During the parties' negotiations with respect to the Sixth Amendment, in addition to having accepted the credit of $200,000, Groupon received and accepted the benefit of the new (lower) rate structure.

46.     Based upon the new (lower) rate structure, which was to be effective retroactively to October 1, 2013, Groupon received at least $734,002.48 in savings on its services invoices.

47.     Despite having accepted the benefits of the parties' settlement of the Inventory Dispute, on or about October 14, 2013, Groupon asserted another inventory claim against Exel relating to the same period of time covered by the parties' settlement (*i.e.*, pre-September 30, 2013), in the amount of $257,864.34.   Without Exel's authorization, and contrary to the Agreement and the parties' settlement of the Inventory Dispute, Groupon unilaterally deducted this amount ($257,864.34) as a credit against an Exel invoice.

48.     In addition, without Exel's authorization, and contrary to the Agreement and the parties' settlement of the Inventory Dispute, Groupon unilaterally deducted another $200,000 as a credit against Exel's invoices (on EFT no. 664.4), above and beyond the $200,000 credit to which Exel had agreed.

49.     In total, Groupon received $1,391,866.48, consisting of (a) $200,000 for the agreed-upon credit; (b) $457,864 in unauthorized credits; and (c) $734,002.48 in reduced rates based upon Exel's implementation of the new (lower) rate structure.

50.     Because Groupon never signed the Sixth Amendment, Groupon was (and is) not entitled to the $1,391,866.48 it received.

—HOLIDAY WAREHOUSE EXTRA CAPACITY—

51.     In advance of the 2013 holiday season, Groupon requested that Exel provide extra warehouse capacity for a projected increase in the volume of Groupon products needing to be warehoused and fulfilled.

52.     Groupon did not submit its request to Exel for increased capacity until very late in the calendar year, thereby requiring Exel to expedite its plans for meeting Groupon's request.   In order to meet Groupon's request, Exel would need to incur additional labor costs to create capacity for additional storage space and to construct additional infrastructure, all in an unusually short period of time.

53.     On December 5, 2013, Exel sent Groupon an e-mail outlining its plans to meet Groupon's request and setting forth an estimate of costs potentially to be incurred to do so. Exel estimated the costs associated with meeting Groupon's request to be $856,000. Because of the limited time frame, Exel informed Groupon that "**[b]ased on the plan below, we will require a response back with approval as soon as possible to proceed in obtaining the equipment and resources we have outlined.**" (Emphasis in original.)

54.     On December 5, 2013, Groupon responded to Exel's e-mail and agreed to Exel's proposal. Specifically, Ron Mardenly of Groupon wrote, "I agree. Let's move forward."

55.     After receiving Groupon's acceptance of Exel's proposal, Exel obtained the equipment and resources needed to expand its warehouse capacity consistent with Groupon's request.

56.     Subsequent to establishing the necessary infrastructure to support the approved expansion, Exel learned that Groupon's projections about an increase in volume of Groupon products needing to be warehoused and fulfilled, would not be met. With that knowledge, Exel immediately began efforts to minimize the costs associated with the holiday expansion needs. As a result of Exel's actions, the total estimated expansion cost of $856,000 was significantly reduced.

57.     Exel has demanded that Groupon pay the amounts incurred by Exel in reliance on the parties' agreement that Exel would provide extra warehouse capacity for Groupon, but Groupon has failed to pay Exel the outstanding amounts.

**—GROUPON TERMINATES THE AGREEMENT AND FAILS TO MEET OUTSTANDING PAYMENT OBLIGATIONS—**

58.     On June 16, 2014, Groupon sent Exel a 90-day termination notice pursuant to Section 3.2 of the Agreement.  In the same letter, Groupon also requested that an audit be conducted pursuant to Section 3.4 of the Agreement.

59.     On June 25, 2014, Exel responded to Groupon's termination notice and indicated its intent to meet its termination-related obligations under the Agreement.

60.     Groupon is past due to Exel in the amount of $1,764,446.26 for the following amounts (principal and late charges):

| Invoice # | Original Invoice Amount | Due Date | Outstanding Invoice Amount |
|---|---|---|---|
| 10410550 | $ 189,502.33 | 10/30/2013 | $ 138,991.35 |
| 10411669 | $ 156,563.10 | 11/7/2013 | $ 139,717.46 |
| 10411667 | $ 135,227.73 | 11/7/2013 | $ 135,227.73 |
| 10423820 | $ 461,381.16 | 2/16/2014 | $ 461,381.16 |
| 10431948 | $ 84,914.92 | 4/25/2014 | $ 57,686.93 |
| 10432505 | $ 113,913.35 | 4/30/2014 | $ 113,913.35 |
| 10433859 | $ 16,969.80 | 5/8/2014 | $ 30.00 |
| 10438042 | $ 36,216.13 | 6/15/2014 | $ 36,216.13 |
| 10438642 | $ 49,603.48 | 6/21/2014 | $ 49,603.48 |
| 10438618 | $ 58,564.64 | 6/21/2014 | $ 58,564.64 |
| 10439155 | $ 34,210.79 | 6/27/2014 | $ 34,210.79 |
| 10439211 | $ 71,388.65 | 6/27/2014 | $ 71,388.65 |
| 10440235 | $ 20,088.67 | 7/3/2014 | $ 20,088.67 |
| 10440241 | $ 56,822.03 | 7/3/2014 | $ 56,822.03 |
| 10441367 | $ 10,688.55 | 7/16/2014 | $ 10,688.55 |
| 10440955 | $ 69,685.18 | 7/10/2014 | $ 69,685.18 |
| 10441659 | $ 4,153.56 | 7/18/2014 | $ 4,153.56 |
| 10441505 | $ 60,738.94 | 7/17/2014 | $ 60,738.94 |
| 10442014 | $ 47,534.77 | 7/23/2014 | $ 47,534.77 |
| 10442027 | $ 37,063.31 | 7/23/2014 | $ 37,063.31 |
| 10442049 | $ 4,153.56 | 7/23/2014 | $ 4,153.56 |
| 10442107 | $ 51,816.87 | 7/23/2014 | $ 51,816.87 |
| 10443782 | $ 46,844.46 | 8/1/2014 | $ 46,844.46 |
| 10443997 | $ 57,924.69 | 8/6/2014 | $ 57,924.69 |

61.     Notwithstanding Groupon's failure to abide by the terms and conditions of the Agreement, Groupon is withholding in excess of $800,000 on purported inventory disputes from Exel pending the results of the audit being conducted pursuant to Section 3.4 of the Agreement.

## COUNT 1:  BREACH OF THE AGREEMENT
### (NON-PAYMENT OF INVOICES)

62.     Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

63.     The Agreement is a valid and enforceable contract supported by adequate consideration.

64.     Exel has fully performed its obligations under the Agreement, and any and all conditions precedent thereto have been satisfied.

65.     Because more than 30 days have passed since Groupon issued a notice of termination, all of Groupon's payment obligations, at least with respect to undisputed amounts, are due and payable.

66.     Groupon breached Sections 2.1 and 3.3(d) of the Agreement by refusing to pay Exel for services rendered under the Agreement, including for amounts not considered "Disputed" under Section 2.3 of the Agreement.

67.     As a direct and proximate result of Groupon's breach of contract, Exel has suffered damages in the amount of at least $1,764,446.26.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 1 and award it compensatory damages in an amount to be decided at trial (but no less than $1,764,446.26) and such other relief as the Court deems just and proper.

## COUNT 2: BREACH OF THE LETTER AGREEMENT

68.     Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

69.     The Letter Agreement is a valid and enforceable contract supported by adequate consideration.

70.     Exel has fully performed its obligations under the Letter Agreement, and any and all conditions precedent thereto have been satisfied.

71.     Groupon breached the Letter Agreement by taking an additional credit of $171,000 above and beyond the $303,000 Freight Credit.

72.     As a direct and proximate result of Groupon's breach of contract, Exel has suffered damages in the amount of at least $171,000.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 2 and award it compensatory damages in an amount to be decided at trial (but no less than $171,000 plus interest thereon at the statutory rate) and such other relief as the Court deems just and proper.

## COUNT 3:  UNJUST ENRICHMENT

73.     Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

74.     Exel and Groupon agreed in principle to settle the Inventory Dispute for a credit of $200,000 and a new (lower) rate structure effective as of October 1, 2013.

75.     In anticipation of the parties' entering into the Sixth Amendment, Exel provided the $200,000 credit to Groupon and implemented the new (lower) rate structure.

76.     Groupon accepted the benefits of (a) the $200,000 credit, and (b) the new (lower) rate structure that resulted in a benefit to Groupon in the amount of $734,002.48.

77. The parties did not execute the Sixth Amendment. Accordingly, there was no settlement of the Inventory Dispute and Groupon was not entitled to the benefits of the agreement reached in principle.

78. Without authorization or agreement by Exel, Groupon took an additional $457,864 in credits relating to inventory disputes covering the time period prior to September 30, 2013.

79. Groupon's retention of the consideration relating to the parties' agreement in principle to settle the Inventory Dispute in the amount of $934,002.48, but without executing the Sixth Amendment, violates fundamental principles of justice, equity, and good conscience.

80. Groupon's retention of an additional $457,864 in credits to which Groupon was (and is) not entitled violates fundamental principles of justice, equity, and good conscience.

81. As a direct and proximate result of Groupon's unlawful conduct, it has been unjustly enriched in the amount of at least $1,391,866.48.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 3 and award it compensatory damages in an amount to be decided at trial (but no less than $1,391,866.48 plus interest thereon at the statutory rate) and such other relief as the Court deems just and proper.

## COUNT 4:  BREACH OF CONTRACT RELATING TO THE INVENTORY DISPUTE (BROUGHT IN THE ALTERNATIVE TO COUNT 3)

82. Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

83. Exel and Groupon reached an agreement in principle, and in fact, to settle the Inventory Dispute, as described herein.

84.     This agreement is a valid and enforceable contract supported by adequate consideration.

85.     Exel has fully performed its obligations under the parties' contract, and any and all conditions precedent thereto have been satisfied.

86.      Groupon breached the parties' contract by taking an additional $457,864 in credits to which it was not entitled.

87.     As a direct and proximate result of Groupon's breach of contract, Exel has suffered damages in the amount of at least $457,864.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 4 and award it compensatory damages in an amount to be decided at trial (but no less than $457,864 plus interest thereon at the statutory rate) and such other relief as the Court deems just and proper.

## COUNT 5:  PROMISSORY ESTOPPEL
## (BROUGHT IN THE ALTERNATIVE TO COUNTS 3 AND 4)

88.     Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

89.     In connection with the parties' discussions concerning the Inventory Dispute, Groupon made an unambiguous promise to Exel that it would settle the Inventory Dispute for (a) a $200,000 credit, and (b) a new (lower) rate structure, as described herein.

90.     Exel relied on Groupon's promise to settle the Inventory Dispute when it provided the $200,000 credit to Groupon and implemented the new (lower) rate structure.

91.     Exel's reliance on Groupon's promise was reasonable, and it was expected and foreseeable by Groupon, in particular given Groupon's statement that it was "fully aligned" with Exel's offer to settle.

16

92.     Exel relied on Groupon's promise to its detriment by (a) meeting the conditions applicable to Groupon's promise to settle all inventory issues through September 30, 2013, but (b) being subject thereafter to Groupon taking an unauthorized credit in the amount of $457,864 relating to the settled claims above and beyond the settlement consideration.

93.     In light of the parties' conduct in settling the Inventory Dispute, Groupon is estopped from taking an additional credit in the amount of $457,864.

94.     As a direct and proximate result of Groupon's wrongful conduct, Exel has suffered damages in the amount of at least $457,864.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 5 and award it compensatory damages in an amount to be decided at trial (but no less than $457,864 plus interest thereon at the statutory rate) and such other relief as the Court deems just and proper.

## COUNT 6: BREACH OF CONTRACT RELATING TO HOLIDAY WAREHOUSE EXTRA CAPACITY

95.     Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

96.     Exel and Groupon reached an agreement in principle, and in fact, relating to extra warehouse capacity for the 2013 holiday season.

97.     This agreement is a valid and enforceable contract supported by adequate consideration.

98.     Exel has fully performed its obligations under the parties' contract, and any and all conditions precedent thereto have been satisfied.

99.     Groupon breached the parties' contract by refusing to pay Exel for the costs incurred by Exel thereunder.

100.    As a direct and proximate result of Groupon's breach of contract, Exel has suffered damages in the amount of at least $461,381.16.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 6 and award it compensatory damages in an amount to be decided at trial (but no less than $461,381.16 plus interest thereon at the statutory rate) and such other relief as the Court deems just and proper.

## COUNT 7:  PROMISSORY ESTOPPEL
## (BROUGHT IN THE ALTERNATIVE TO COUNT 6)

101.    Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

102.    In connection with the parties' discussions concerning the extra warehouse capacity for the 2013 holiday season, Groupon made an unambiguous promise to Exel that it would pay Exel up to $856,000 for costs incurred by Exel to expand its capacity, as described herein.

103.    Exel relied on Groupon's promise to pay for these costs when it procured the resources and equipment necessary, and began the work, to effectuate the expansion.

104.    Exel's reliance on Groupon's promise was reasonable, and it was expected and foreseeable by Groupon, in particular given Groupon's agreement to same and its instruction to Exel to "move forward."

105.    Exel relied on Groupon's promise to its detriment by (a) incurring certain of the anticipated costs, but (b) failing to receive payment from Groupon for same.

106.    In light of the parties' conduct, Groupon is estopped from refusing to pay Exel for these incurred costs.

107.    As a direct and proximate result of Groupon's wrongful conduct, Exel has suffered damages in the amount of at least $461,381.16.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 7 and award it compensatory damages in an amount to be decided at trial (but no less than $461,381.16 plus interest thereon at the statutory rate) and such other relief as the Court deems just and proper.

### COUNT 8:  REQUEST FOR DECLARATORY JUDGMENT (28 U.S.C. § 2201)

108.    Exel incorporates by reference the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

109.    The parties are engaged in the post-notice-of-termination audit process prescribed by Section 3.4 of the Agreement.  In connection therewith, Groupon has withheld more than $500,000 from Exel pending the results of the audit.

110.    In light of Groupon's prior material breach of the Agreement, as described herein, Groupon is not entitled to withhold any sums from Exel.

111.    There is a live and justiciable controversy between and among the parties as to Groupon's right, if any, to withhold any sums from Exel under the Agreement.

112.    Pursuant to 28 U.S.C. § 2201, "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

113.    The Court's resolution of this controversy will fully and finally determine the parties' rights and obligations with respect to such withholding.

WHEREFORE, Exel respectfully requests the Court to enter judgment in its favor on Count 8, declare that Groupon is not entitled to hold back any sums from Exel pending the results of the audit, and award such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Exel hereby demands a jury trial for all issues in this case that properly are subject to a jury trial.

Dated: August 12, 2014                    Respectfully submitted,

                                          EXEL INC.

                                          By:   */s/ James V. Garvey*
                                          _____
                                                  One of Its Attorneys

James V. Garvey
Nicole J. Highland
Vedder Price P.C.
222 North LaSalle Street
Suite 2600
Chicago, Illinois  60601-1003
T:  +1 (312) 609-7500
jgarvey@vedderprice.com
nhighland@vedderprice.com